# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DANIEL F. HO, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08-757 (JDB)** |
| | ) | |
| **STUDENT EXCHANGE VISITOR** | ) | |
| **PROGRAM, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION TO DISMISS AS MOOT

Pursuant to Fed. R. Civ. P. 12(b)(1), Defendants move to dismiss this case for lack of subject matter jurisdiction on the ground that the case has become moot. The Court is respectfully referred to the attachment Memorandum of Points and Authorities in Support of this Motion and Supporting Declaration of Dianne Currie. A proposed order is also attached.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
 (202) 514-7137

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DANIEL F. HO, <u>et</u> <u>al.</u>,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 08-757 (JDB)** |
| | ) |
| **STUDENT EXCHANGE VISITOR** | ) |
| **PROGRAM, <u>et</u> <u>al.</u>** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AS MOOT**

## I. INTRODUCTION

Defendants United States Department of Homeland Security, United States Immigration and Customs Enforcement, and Student Exchange and Visitor Program ("SEVP") move this Court to dismiss Plaintiffs' complaint which requests the vacatur of SEVP's decision approving Mr. Avery's request to designate himself as Principal Designated School Official ("PDSO") for the University of Northern Virginia (UNVA), and seeks to appoint Daniel Ho as PDSO, as moot. This relief is no longer at issue in light of the events of *University of Northern Virginia, Inc. v. Avery, et al., Case No. 2008-5145* (Va. Cir. Ct. June 13, 2006) (order granting temporary injunctive relief), in which the Fairfax County Circuit Court, with the acquiescence of Mr. Ho's counsel, appointed James Dillard II to run the operations of UNVA. Upon his appointment, Mr. Dillard initially informed SEVP that Mr. Avery will remain the PDSO. Approximately two weeks later, Mr. Dillard then informed SEVP that Mr. Avery resigned from UNVA, whereupon Mr. Dillard requested that Daniel Ho be appointed PDSO, which request was

granted by SEVP.

Any challenges to SEVP's December 6, 2007, decision approving Mr. Avery's request to remove Roy Ho as PDSO and replace Mr. Ho with himself, is now moot under these circumstances. Similarly, Plaintiffs' claim that Daniel Ho should be PDSO during the pendency of the Notice of Intent to Withdrawal (NOIW) proceedings, and not Mr. Avery, is also moot.[1]

## II. <u>SUMMARY OF RECENT FACTS</u>

The attached Order from the Fairfax County Circuit Court appointed Mr. Dillard to oversee the running of UNVA in accordance with the discretion and authority set forth in the attached transcripts of proceedings. Attachment 1 (June 13, 2008 Order). As the attached transcripts of proceedings clarified, the Court appointed Mr. Dillard to "run the show" for UNVA, be the "decision-maker," or be, "for lack of any better term, the chancellor" of UNVA until sometime after the August 11, 2008, trial in that proceeding. Attachment 2 (June 12, 2008 Transcript) at pp. 11:10, 16:7-8 (Judge Klein's statements); Attachment 3 (June 10, 2008 Transcript) at p. 13:7 (Judge Klein's statements). Both sides, Mr. Avery and the "Ho Group," agreed that Mr. Dillard would have the ultimate decision-making authority for UNVA to determine what was best for the school, including issues pertaining to school records, and "nobody has a problem with that." Attachment 2 at pp. 9: 20-21, 12:2-3, 23:8-14, 26:9 (Judge Klein's statements). Counsel

---

[1]By Minute Order, dated August 14, 2008, this Court granted Plaintiffs' Motion to Supplement the record with documents they claim to have submitted in connection with the issues in this case. However, Defendants treated those submissions as part of the NOIW proceedings which is still ongoing. In light of this motion, Defendants intend to move for a stay with respect to that order pending the resolution of this motion.

for Mr. Ho, James B. Kinsel, also agreed to a compensation rate for Mr. Dillard of $10,000/month and the availability of staff. *Id.* at pp. 21:10-12; 26:20-21; 27:3-4; 28:5-7.

On June 26, 2008, Mr. Dillard contacted Ms. Dianne Currie of SEVP to inform her of the Fairfax County Circuit Court's actions. *See* Attachment 4 (Third Declaration of Dianne Currie) at Paragraph 3. Mr. Dillard's appointment by the Fairfax County Circuit Court qualifies him as head of the school under 8 C.F.R. § 214.3(l)(1) and, accordingly under the same regulation, gives him the authority to appoint a PDSO for UNVA. *See id.* at Paragraph 4; Attachment 5 (Fourth Declaration of Dianne Currie) at Paragraph 3. Mr. Dillard indicated to Ms. Currie that Mr. Avery would remain the PDSO. *See* Attachment 4 at Paragraph 5.

Approximately two weeks later, on Friday, July 11, 2008, SEVP was informed by Mr. Dillard that Mr. Avery had resigned as PDSO, and was also informed by Mr. Avery of that fact. *See* Attachment 5 (Fourth Declaration of Dianne Currie) at Paragraph 5. On July 15, 2008, Mr. Dillard informed SEVP that Mr. Avery had resigned from UNVA and formally requested in writing that Daniel Ho be appointed as PDSO. *Id.* at 6. SEVP approved the request and, on July 17, 2008, completed the reprogramming of the access codes for Daniel Ho as the new PDSO. *Id.* at 7. Accordingly, Daniel Ho is the acting PDSO for UNVA.[2]

### III. DISCUSSION

"The exercise of judicial power under [Article] III of the Constitution depends on

---

[2] Defendants understand from Plaintiffs' counsel in this case that, as of August 7, 2008, there has been a settlement of the Virginia case between Plaintiffs and Fay Avery, the contents of which are still unknown to Defendants.

the existence of a case or controversy." *Preiser v. Newkirk,* 422 U.S. 395, 401 *(*1975).

In this respect, the Supreme Court explained as follows:

> As the Court noted in *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971), a federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.' Its judgments must resolve "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Ibid.*, quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). As the Court noted last Term, in an opinion by Mr. Justice Brennan, *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974): 'The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. *See, e. g.*, *Roe v. Wade*, 410 U.S. [113,] 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 [(1973)]; *SEC v. Medical Comm. for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).'

*Id.* at 401-02; *see also DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974).  Therefore, "[i]f events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot." *Del Monte Fresh Produce Co. v. U.S.*, No. 07-2143(JDB), 2008 WL 2746051, at *3 (D.D.C. July 16, 2008) (citing *McBryde v. Comm. to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States,* 264 F.3d 52, 55 (D.C. Cir. 2001)).

In this case, Plaintiffs' challenged SEVP's approval of Mr. Avery's request to make himself PDSO (Counts I and II), contended that SEVP acted improperly by allowing Mr. Avery to remain PDSO even after Plaintiffs alleged that Mr. Avery was terminated (Count IV), and argued that SEVP should have "reinstated" Daniel Ho as the PDSO before and during the pendency of the NOIW proceedings (Count III).  In short, Plaintiffs sought the removal of Mr. Avery as PDSO and the subsequent appointment of

Daniel Ho as PDSO.

On June 26, 2008, however, Mr. Dillard, UNVA's new head of school, confirmed

Mr. Avery's designation as PDSO and his continued employment with the school, thus

Counts I, II , and IV of Plaintiffs' Complaint became moot at that point.   Even if the

Court disagrees, however, all Counts of the Complaint were moot after Mr. Avery

resigned from UNVA and SEVP approved Mr. Dillard's request of July 15, 2008, as head

of the school, pursuant to 8 C.F.R. § 214.3(l)(1), to make Daniel Ho the new PDSO.

Attachment 5 at ¶ 7.  Accordingly, there is no continuing controversy as Daniel Ho, and

not Mr. Avery, is the PDSO for UNVA.  *See Del Monte Fresh Produce Co., supra*

(holding plaintiff's complaint seeking a judgment declaring that the Office of Foreign

Assets Control unlawfully withheld or unreasonably delayed issuance of a single license

became moot after said license was subsequently issued).

To the extent that Plaintiffs may challenge dismissal as excepted pursuant to one

of the two exceptions to the mootness doctrine, *i.e.,* actions "capable of repetition yet

evading review" and defendant's "voluntary cessation" of the offending conduct, neither

apply to this case.  *See id.* at *3.   With respect to the first exception, Plaintiffs challenged

(1) the December 6, 2007 SEVP decision to approve Avery's request to appoint himself

as PDSO and (2) SEVP's failure to remove him and appoint Daniel Ho as the PDSO

before and during the pendency of the NOIW.   SEVP, however, approved Mr. Dillard's

request to make Daniel Ho PDSO, pursuant to 8 C.F.R.  214.3(l)(1), and Avery has

resigned from UNVA, making Avery ineligible to be a PDSO under the same regulation.

Because Mr. Dillard is the head of the school, Daniel Ho is the PDSO, and Mr. Avery is

not eligible as PDSO, the above events alleged in the Complaint are not capable of

repetition. *See id.* at * 5 (holding delay on a challenged license application was not "capable of repetition" after said license was issued).

The second exception to the mootness doctrine, "voluntary cessation" of the offending conduct, also does not apply in our case. "[T]he voluntary cessation doctrine does not apply when the challenged activity stops for reasons unrelated to litigation." *Wyo. Outdoor Council v. Dombeck,* 148 F.Supp.2d 1, 8 n. 1 (D.D.C. 2001). The doctrine also does not apply if "'there is no reasonable expectation ... that the alleged violation will recur' and . . . evidence that 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Del Monte Fresh Produce Co., 2008 WL 2746051, at * 5 (quoting Doe v. Harris*, 696 F.2d 109, 111 (D.C.Cir. 1982)) (*citing County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Outside the context of this litigation, SEVP approved the request of Mr. Dillard, in the normal course of SEVP business and pursuant to 8 C.F.R. § 214.3(l)(1), to appoint Daniel Ho as PDSO. Further, and as discussed *supra*, the limited events presented in Plaintiffs' complaint are not capable of repetition as Daniel Ho is PDSO and Mr. Avery has resigned from UNVA.

In addition, to the extent that Plaintiffs attempt to reframe this case into one with a broader potential harm, Defendants submit that under the law in this jurisdiction, Plaintiffs' cause of action is limited to the four counts in the Complaint and only those four counts are before the Court. Should Plaintiffs urge a "broader notion of their injury than the one on which they originally sought relief," they should be "estopped" from doing so. *See Del Monte Fresh Produce Co., 2008 WL 2746051, at * 4 (citing Clarke v. United States*, 915 F.2d 699, 703 (D.C.Cir. 1990) (*en banc*). Accordingly, this case is now moot for the reasons discussed above.

7

IV. <u>CONCLUSION</u>

Because Mr. Avery was initially authorized by Mr. Dillard to remain PDSO, and

Daniel Ho, after Mr. Avery's resignation, has since replaced Mr. Avery as the PDSO

through the normal course of events pursuant to 8 C.F.R. § 214.3(l)(1), Plaintiffs'

complaint is now moot and should be dismissed.

<div style="margin-left: 40%;">

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
 (202) 514-7137

</div>

Attachment 1

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

UNIVERSITY OF NORTHERN VIRGINIA, INC.    )
                                     )
        Plaintiff,                 )
                                     )
v.                                     )     Case No. 2008-5145
                                     )
FAY R. AVERY, et al.               )
                                     )
        Defendants.            )

**ORDER**

THIS Matter came to be heard on the Motion for a Temporary Injunction filed by the Plaintiff University of Northern Virginia, Inc. ("UNVA") on June 6, 2008; and

From the pleadings, affidavits presented, and argument of counsel, the Court hereby employs the test set forth in *Blackwelder Furniture Company v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977), and makes the findings set out in pages 4 –32 of the attached transcript of this Court's hearing on June 10, 2008 and, for the reasons set forth in pages 9-41 of the attached transcript of this Court's hearing on June 12, 2008, which portions of the two transcripts are incorporated herein by reference, the Court finds that the Motion for Temporary Injunctive Relief should be granted in part and denied in part; therefore it is ORDERED that

     1.     The Plaintiff's Motion for Temporary Injunctive Relief is granted in part and denied in part;

     2.     The Defendants shall be temporarily enjoined from acting on behalf of UNVA to the extent set forth in the attached transcripts and until the conclusion of the trial in this matter, which is scheduled to begin on August 11, 2008 in this Court;

*AH 1*

3.    James H. Dillard, II shall be appointed ~~as the Receiver~~ *to oversee the running* of UNVA in accordance with the attached transcripts until conclusion of the trial in this matter and further Order of this Court.  Mr. Dillard shall be compensated by UNVA at the rate of $10,000 per month plus expenses.

4.    In consultation with both the Plaintiffs and the Defendants in this case, Mr. Dillard shall be in charge of the day-to-day operations of UNVA including those specific actions and with the discretion and authority set forth in the transcripts attached hereto.

5.    As required by Section 8.01-620 of the Code of Virginia, the Plaintiff shall be required to post a bond of $1,000 in cash.

And this matter is continued.

ENTERED this  13  day of June, 2008:

_____

The Honorable Stanley Paul Klein
Judge

A COPY TESTE:
JOHN T. FREY, CLERK
BY: _____
Deputy Clerk

Original retained in the office of
the Clerk of the Circuit Court of

SEEN AND OBJECTED TO FOR THE REASONS
STATED ON THE RECORD AND IN THE
PLEADINGS FILED WITH THE COURT:


W. Michael Holm (VSB # 21035)
James B. Kinsel (VSB # 44247)
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
8065 Leesburg Pike, Fourth Floor
Vienna, Virginia 22182
Telephone:    (703) 790-3310
Facsimile:    (703) 918-2254

*Attorneys for Plaintiff*


SEEN AND OBJECTED TO WITH RESPECT TO
PARAGRAPHS ONE AND TWO OF THIS ORDER


J. Jonathan Schraub (VSB # 17366)
Danny M. Howell (VSB # 30352)
Heather Austin Jones (VSB # 48431)
Michael T. Marr (VSB # 48536)
Sands Anderson Marks & Miller
1497 Chain Bridge Road
Suite 202
McLean, VA 22101

*Counsel for Defendants and Intervenor*

Attachment 2

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

---

**Page 1**

VIRGINIA:
   IN THE CIRCUIT COURT OF FAIRFAX COUNTY

------------------------x

UNIVERSITY OF NORTHERN
VIRGINIA, INC.,
    Plaintiff,

-vs-      CL No. 2008-5145

FAY R. AVERY, et al.,
    Defendants.

------------------------x

         Thursday, June 12, 2008
         Fairfax, Virginia

    Whereupon, a hearing was held at the Fairfax
County Courthouse, Courtroom 5H, 4110 Chain Bridge
Road, Fairfax, Virginia, before THE HONORABLE STANLEY
P. KLEIN, at 8:00 a.m. in the above-entitled matter,
taken stenographically by RANDY T. SANDEFER, RPR, when
were present on behalf of the respective parties:

---

**Page 2**

1  APPEARANCES:
2    On behalf of the Plaintiff:
3      JAMES B. KINSEL, ESQ.
4      W. MICHAEL HOLM, ESQ. ESQ.
5      Womble, Carlyle, Sandridge & Rice, PLLC
6      8065 Leesburg Pike, Fourth Floor
7      Tysons Corner, Virginia 22182-2738
8      (703) 394-2212
9
10   On behalf of the Defendants:
11    MICHAEL MARR, ESQ.
12    HEATHER AUSTIN JONES, ESQ.
13    Sands, Anderson, Marks & Miller, P.C.
14    1497 Chain Bridge Road, Suite 202
15    McLean, Virginia 22101
16    (703) 893-3600
17
18    CHRISTOPHER T. PICKENS, ESQ.
19    Hogan & Hartson LP
20    8300 Greensboro Drive, Suite 1100
21    McLean, Virginia 22102
22    (703) 610-6100

---

**Page 3**

1       P R O C E E D I N G S
2    (Whereupon, the reporter was sworn.)
3    THE COURT: Okay.
4    THE OPERATOR: Counsel, the line is open.
5    THE COURT: Mr. Dillard? Is Mr. Dillard on
6  the line, please?
7    THE OPERATOR: Your Honor, this is the
8  operator. I have a Tom Connally on the line.
9    MR. CONNALLY: Good morning, Judge Klein.
10    THE COURT: Good morning, sir.
11    MR. CONNALLY: I have with me Roger Lerner
12  from the Sack, Harris & Martin firm as well.
13    MR. LERNER: Good morning, Your Honor.
14    THE COURT: I'm sorry; which firm?
15    MR. CONNALLY: Sack, Harris & Martin, Your
16  Honor. We are not counsel of record.
17    THE COURT: You are now counsel of record for
18  whom?
19    MR. LERNER: I'm sorry; I said we are not
20  counsel of record.
21    THE COURT: Okay. And your involvement in
22  the matter before me this morning is?

---

**Page 4**

1    MR. LERNER: We have been representing, Your
2  Honor, several of the defendants in the suit. Our
3  business is related in settlement-related issues.
4    THE COURT: Okay. Well, this is a public
5  hearing, so you are entitled to listen in if you would
6  like. I wanted to find out if Mr. Dillard is on the
7  line.
8    THE OPERATOR: He has not dialed in, Your
9  Honor.
10    THE COURT: He has not dialed in?
11    THE OPERATOR: He has not.
12    THE COURT: Okay. Well, we will wait for
13  him.
14    (Pause.)
15    MR. PETERSEN: Judge, do you want me to call
16  him?
17    THE COURT: Give him a moment or two. My
18  understanding was that you were, in fact, in touch with
19  him yesterday, because he called --
20    MR. PETERSEN: I gave him the pass code that
21  your clerk gave me, so I gave him the number.
22    THE COURT: Mr. Petersen, why don't you step

---

AH 2

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

| Page 5 | Page 7 |
|---|---|
| 1  outside, if you wouldn't mind; just between the outside | 1  MR. PETERSEN: 3470. |
| 2  of the courtroom so you and I could see each other. I | 2  THE COURT: And then, the operator, if |
| 3  will go like this (indicating) if he gets on. | 3  Mr. Dillard calls in, what do you need? |
| 4  Thank you. | 4  THE OPERATOR: I will simply ask him for his |
| 5  (Pause.) | 5  phone number, and then I will get him into the |
| 6  MR. PETERSEN: I've got him on the cell | 6  conference. |
| 7  phone, Judge. He is on hold on the conference call | 7  THE COURT: Okay. |
| 8  line. | 8  MR. PETERSEN: Jim, try that number. |
| 9  THE COURT: He is on hold? | 9  THE COURT: He is calling in right now, but |
| 10  Is the operator on? | 10  he is not the one being billed. He is not the one |
| 11  THE OPERATOR: Yes, I am here. | 11  being billed for his participation today. The law |
| 12  THE COURT: Mr. Dillard says he is on hold, | 12  firms are supposed to be billed. |
| 13  and that's the other person that I am waiting for. | 13  THE OPERATOR: Okay. I will get that |
| 14  THE OPERATOR: Your Honor, he is not on hold | 14  information from him, Your Honor. |
| 15  on any of our equipment. He has not dialed in to us | 15  MR. PETERSEN: He is calling in that number, |
| 16  this morning. | 16  Your Honor. |
| 17  He could dial the -- if you would like to | 17  MR. CONNALLY: You can bill the Hogan & |
| 18  pass this number on to him, and -- | 18  Hartson firm, and we will take care of it. |
| 19  THE COURT: Yes. Why don't you give me the | 19  THE COURT: Okay. |
| 20  number, and I will pass it on. | 20  THE COURT: While we are waiting, who is |
| 21  THE OPERATOR: 1-800. | 21  going to be speaking for the different parties? |
| 22  THE COURT: 1-800. | 22  Because after we take care of finding out |

| Page 6 | Page 8 |
|---|---|
| 1  THE OPERATOR: 447. | 1  whether Mr. Dillard is willing to participate and serve |
| 2  THE COURT: 447. | 2  in the role that I envisioned, I want to talk about |
| 3  THE OPERATOR: 3470. | 3  August. So who is going to be participating? |
| 4  THE COURT: 3470. | 4  Who is going to be speaking for the parties? |
| 5  THE OPERATOR: Then I will just leave his | 5  MR. KINSEL: I will be speaking, Your Honor. |
| 6  phone number, and we will take care of the billing | 6  THE COURT: Mr. Kinsel; okay. |
| 7  stuff later. | 7  MR. MARR: Michael Marr, Your Honor. |
| 8  MR. PETERSEN: Judge, I have him on my cell | 8  THE COURT: Okay. |
| 9  phone. Do you want to tell him that number? | 9  Ms. Austin Jones, who is that gentleman |
| 10  THE COURT: 1-800. | 10  sitting on the other side of you this morning? He |
| 11  MR. PETERSEN: Jim, listen to this number: | 11  looks vaguely familiar to me. |
| 12  1-800. | 12  MS. JONES: Your Honor, I just actually -- |
| 13  THE COURT: 447. | 13  MR. DILLARD: Good morning, Your Honor. This |
| 14  MR. PETERSEN: 447. | 14  is Jim; I am on the line. |
| 15  THE COURT: 3470. 3470. | 15  THE COURT: Okay. Mr. Dillard, good morning. |
| 16  MR. PETERSEN: Okay. I'm sorry. Jim, hold | 16  This is Judge Klein. |
| 17  on a second. 1-800. | 17  MR. DILLARD: How are you today? |
| 18  THE COURT: 447. | 18  THE COURT: I appreciate your participation |
| 19  MR. PETERSEN: 447. | 19  this early in the morning. I hope we didn't get you up |
| 20  THE COURT: 3470. | 20  too much earlier than you are used to getting up in the |
| 21  MR. PETERSEN: 3470? | 21  morning. |
| 22  THE COURT: Right. | 22  MR. DILLARD: Not down here. |

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

Page 9

1       THE COURT: Mr. Dillard, let me tell you what
2  the situation is, what led up to this phone call, what
3  I have in mind, what I have already informed counsel;
4  and we can then have the conversation that you wanted
5  to have.
6       Counsel, in case you don't know, Mr. Dillard
7  called me the other day because he wanted to find out
8  the parameters of what I had in mind without talking
9  any specifics, about the substance.
10      I told Mr. Dillard that we had arranged to
11  have this hearing this morning at 8:00 o'clock and that
12  I did not believe it would be appropriate for me to
13  discuss the issue with him without counsel hearing
14  exactly what was going on.
15      Mr. Dillard trusted me enough to accept my
16  representation that the problem would be a breach of
17  judicial ethics for that conversation to take place.
18      Mr. Dillard, I don't know what you know about
19  the dispute relating to the University of Northern
20  Virginia, but I am going to term two groups. There is
21  the Ho group, and there is the Avery group.
22      Unfortunately, they do not see things in a

Page 10

1  matter that is at all consistent at the present time,
2  and there is a dispute about who ought to be leading
3  the university both legally and for purposes of running
4  the university the way that the university needs to be
5  run.
6       There was a request made by one of the groups
7  for a preliminary injunction so that that group would
8  be able to prevent the other group from really being on
9  campus or having anything to do with the university in
10  the interim period of time.
11      I was given extensive briefs, and I was also
12  given a number of different affidavits from people for
13  my consideration. And as I read through the materials,
14  I started to realize that it would be difficult at best
15  for me to make a reasonable decision on the preliminary
16  injunction request.
17      The case is set for trial on its merits in
18  the middle of August. At that time the Court is going
19  to be able to entertain the presentation of all of the
20  evidence that all of the parties want to produce, and
21  then a final ruling on the merits will be made.
22      What the preliminary injunction really dealt

Page 11

1  with what is going to happen between now and the
2  time that the Court makes its determination on the
3  merits in August. As I thought more about what the
4  situation was, it dawned on me that the best result for
5  the public -- the students, the faculty members, those
6  people having involvement in this particular university
7  -- would be to have someone neutral, someone who the
8  Court could trust, someone who had knowledge of the
9  education system who would serve as the interim person
10  to run the show for the university in the interim
11  period of time.
12      I hope you are flattered -- you should be
13  flattered -- that the first person that I thought of
14  when I conjured up that type of a role was Jim Dillard
15  based upon my knowledge of your commitment to education
16  in this state for decades and your knowledge of the
17  in's and out's of the education system.
18      So as I was looking through paperwork, I saw
19  your name mentioned as having some shares of this
20  entity. I broached that with counsel, and I -- I
21  didn't ask whose side you might possibly be on; but to
22  your credit, once again, Mr. Dillard, both sides said

Page 12

1  that you -- if there was going to be somebody who would
2  serve in this particular role, both sides agreed that
3  Jim Dillard would be as good as anybody if Jim Dillard
4  was willing to do this.
5       So a couple days ago I rendered a ruling. I
6  granted a preliminary injunction in part and I denied
7  it in part. To the extent that it was granted, the
8  group against whom the preliminary injunction was
9  sought was enjoined from doing anything relating to the
10  running of this university without appropriate
11  consultation with you, if you were willing to take on
12  this role.
13      What I envisioned was basically the following
14  -- well, before I get to that, I also told counsel,
15  before Chap Petersen told me that was one of the things
16  that you wanted to make sure of, and that is that you
17  would be reasonably compensated for your time and
18  effort.
19      Then Mr. Petersen, speaking on your behalf
20  because you two had spoken, advised that that was one
21  of the things that you were concerned about. The other
22  thing you were concerned about is the extent of the

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

## Page 13

1   time commitment involved.
2        I told everyone that as far as the time
3   commitment, that is something that I would want to
4   discuss with you. I have never run a university or
5   been in the position I am envisioning for you to
6   undertake if you are willing to do it.
7        I would want to hear from you about what time
8   commitment you would envision that would require and
9   whether that's a time commitment that you could give us
10  at this time of your professional and personal life.
11       So what I envisioned was this: I envision
12  that you would meet with the two factions to find out
13  what the concerns were on both sides.
14       I know that there have been concerns
15  expressed about students wanting to transfer and
16  whether things were being done to enable students to
17  properly transfer, and what we could do to try to stem
18  the tide of what I have been told may be an inordinate
19  number of students who were looking to transfer at this
20  time. Basically, to get the university up and running
21  and on its feet in the interim period of time so that
22  students would realize that this --

## Page 14

1        MR. DILLARD: Let me interrupt one second.
2        THE COURT: Yes, sir.
3        MR. DILLARD: When you say students wanting
4   to transfer, were they talking about transferring to
5   other schools or within the two combined problems here?
6        Do you know what I am saying?
7        THE COURT: Yes, sir. What I was told was
8   the students wanted to transfer to other institutions.
9        Now, the full accuracy of that at this point
10  I don't know, because I was able to glean that
11  information from the affidavits and through briefs of
12  counsel. But, obviously, we don't want there to be a
13  wholesale exodus of the students of the university to
14  other institutions because that, obviously, would not
15  be in the best interests of the university.
16       So that was an issue.
17       There was an issue about the awarding of
18  diplomas, where I was being told that there was a
19  concern about the legitimacy of diplomas being issued
20  and the potential effect that could have on the
21  university in the long-term if issues were to arise
22  about the diplomas being granted to students who were

## Page 15

1   -- did not take care of their requirements to get such
2   diplomas.
3        There are, obviously, issues about the day-
4   to-day policies of how the university is going to be
5   run. That doesn't mean that I envision you sitting at
6   a desk and every single decision that had to be made
7   would be made by Jim Dillard. But the underlying
8   policies and the delegation of responsibilities to make
9   sure that the school continued to be up and running as
10  best we can between now and August was, again,
11  something that I envisioned you overseeing.
12       Then there were questions about access to the
13  records of the university. There were questions about
14  access to the campus.
15       It appears to me at the present time that the
16  so-called Avery group is on the Manassas campus and the
17  so-called Ho group is in Annandale.
18       There were requests being made for access to
19  other parts of the university, and I told counsel that
20  is not something that I would like to decide unless I
21  had to, that that would be something that I would
22  rather leave to you after consultation with the sides

## Page 16

1   and say that as far as you were concerned, these people
2   can have access, these people can have these offices;
3   or if you felt it more appropriate that you wanted to
4   keep the different groups separate, then that would be
5   a call for you to make.
6        Ultimately, what I am envisioning for the
7   interim period of time is you would be, for lack of any
8   better term, the chancellor of this university for a
9   couple of months, and you would delegate responsibility
10  as you felt responsibility should be delegated. But
11  the ultimate policy decisions to be made about how this
12  university would be run in the interim period of time
13  until the case could be resolved on its merits would be
14  decided by Jim Dillard.
15       If the two sides didn't like it, well, they
16  were going to have their opportunity to present all of
17  the evidence they want to present come August 11; but
18  you would be making those types of decisions in the
19  interim period of time.
20       The other issue was money, as far as what was
21  going to happen with the university's money. I was
22  advised by counsel at the end of the hearing that they

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

## Page 17

1  felt that that was pretty much under control. But even
2  then, if there was some issue about expenditure of some
3  sizable sum between now and August, I had also
4  envisioned you being the final arbiter of that; again,
5  with a view towards keeping this university in the best
6  possible posture it could be kept in, in the best
7  possible light for the public, its students, and its
8  professors until such time as the Court can entertain
9  all of the evidence and make a decision based upon the
10 law and the evidence as to what the situation is going
11 to be going forward.
12      Obviously, this is a crucial period of time
13 because there is a new semester coming up, and I wanted
14 to keep the university in as good stead as it could
15 possibly be kept in the interim period of time.
16      MR. DILLARD: Their new semester would be
17 when?
18      THE COURT: I am not sure.
19      When does the new semester start?
20      MR. KINSEL: The end of June, Your Honor, is
21 my understanding.
22      THE COURT: The end of June would be the

## Page 18

1  summer term. When would the --
2       MR. KINSEL: That's the summer term, Your
3  Honor.
4       THE COURT: When would the fall term start?
5  Well, obviously --
6       MR. KINSEL: September 9; around September 9.
7       THE COURT: September 9 would be when the
8  fall term would start --
9       MR. KINSEL: End of September.
10      THE COURT: Excuse me?
11      MR. KINSEL: End of September.
12      THE COURT: End of September would be when
13 the fall term would start.
14      And, Mr. Dillard, all decisions would be made
15 by at least a couple weeks before then as far as who
16 was running the show, what the situation is. All legal
17 decisions would be made, and I can't imagine that your
18 responsibility would stretch beyond maybe the first
19 week in September, if that far.
20      What I am looking to try to do is to keep
21 things going as well as possible until the Court can
22 entertain all of the evidence and can make the legal

## Page 19

1  decisions that ultimately will be the Court's
2  responsibility to make.
3       I just want somebody who I know would act in
4  the best interests of the university and not be
5  concerned about the best interests of either one of
6  these groups; somebody that I know has the experience
7  to do it; somebody I know would be willing to tell
8  either or both of these groups I'm sorry, I have made
9  my decision and that is it; and who would have the
10 independence to make the right decisions.
11      That's why I am asked Jim Dillard if Jim
12 Dillard would be willing to take on this responsibility
13 for the next couple of months.
14      MR. DILLARD: Okay. I guess one of the big
15 questions would be as far as the staff that is
16 presently there and presently operating the school.
17      I assume they would all stay on?
18      THE COURT: It is my understanding that they
19 would except to the extent that you would determine
20 that changes in staff need to be made on an interim
21 basis.
22      MR. DILLARD: Right. But the existing staff,

## Page 20

1  the people who are running the day-to-day operations,
2  would at this point at least stay on as they are now on
3  both campuses?
4       THE COURT: That is my understanding; that's
5  my expectation.
6       MR. DILLARD: The Annandale campus has people
7  that are running that show?
8       THE COURT: Hold on for one second, please.
9  Can you hear? Is that microphone working?
10      MR. KINSEL: No, Your Honor. I can only hear
11 through your speaker.
12      THE COURT: Mr. Dillard, I am going to turn
13 this up a little bit.
14      MR. PARROTT: Maybe you could put it on the
15 top of --
16      THE COURT: Yes. Those microphones are
17 supposed to be working. I am not sure why they are
18 not.
19      Have you pressed the buttons?
20      MS. JONES: I think they are just for
21 talking, Your Honor.
22      THE COURT: They are not supposed to be; they

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

### Page 21

1  are supposed to be for both. They are supposed to be
2  for talking and listening.
3       Mr. Dillard, are you still with me?
4       MR. DILLARD: Yes.
5       THE COURT: Okay. I have put the volume up
6  to as high as I can put it.
7       And, Counsel, I don't have any reason to
8  believe that the staff in either Annandale or Manassas
9  would be leaving.
10      MR. KINSEL: It is my expectation that
11 Mr. Dillard would have staff available to assist him,
12 yes.
13      MR. MARR: That's my understanding as well,
14 Your Honor.
15      THE COURT: Mr. Dillard, counsel for both
16 sides are saying that my understanding is consistent
17 with their understanding, that you would have staff
18 available at both Annandale and Manassas.
19      MR. DILLARD: Okay. That's an important
20 factor.
21      THE COURT: Obviously.
22      MR. KINSEL: Your Honor, just for

### Page 22

1  clarification; there is really not much that is in
2  Annandale. There is no real staff in Annandale. The
3  whole staff and the functionality of the university is
4  at Manassas, but there is staff available.
5       THE COURT: Mr. Dillard, it is counsel's
6  understanding that most of the staff, if not virtually
7  the entirety of the staff, is out in Manassas.
8       Where you would be operating from, I am going
9  to leave up to Jim Dillard. Obviously, where you
10 wanted to make sure that you had appropriate office
11 space, we would see to it that you had appropriate
12 office space. Or if you wanted to have an office both
13 in Annandale and an office in Manassas so that you
14 could speak to whoever you wanted to speak under
15 arrangements that you felt were appropriate, we will
16 make sure that you are accommodated in that regard.
17      MR. DILLARD: Well, it would seem at this
18 point that the Manassas campus is where things would
19 probably be taking place for the most part.
20      THE COURT: That's what I envision based upon
21 my understanding, Mr. Dillard; but I also wanted you to
22 have access to Annandale to the extent that you wanted

### Page 23

1  to. Part of what was in dispute is what access the Ho
2  group would have to the Manassas campus -- right now
3  they don't have access -- and I said that as far as I
4  was concerned, that would be Jim Dillard's decision.
5       Obviously, he would speak to the Ho group, he
6  would speak to the Avery group, and Mr. Dillard would
7  decide what would be best for this university in the
8  next two months. And whatever he felt was best for the
9  university, he would tell everyone, and that's the way
10 it would be run for the next two months including
11 access.
12      Same thing with the school's records; that
13 whatever you felt was in the best interests of the
14 university, we would take care of.
15      Ultimately, Mr. Dillard, I won't bore you
16 with the law, but there are different factors that the
17 Court needs to take into consideration in determining
18 whether a preliminary injunction would issue. To me,
19 in this case -- as I told counsel -- for the first time
20 in 16 years on this bench, I found that the public
21 interest was the most important thing to consider in
22 light of all of the pro's and the con's of all of the

### Page 24

1  factors for my consideration; which is all the more
2  reason why I wanted somebody like you to be making the
3  interim decisions, because I trust that the public
4  interest would be best served if someone like Jim
5  Dillard was the one to be making the decisions, the
6  final decision-making in the interim period of time.
7       MR. DILLARD: Okay. Let me -- I have some
8  questions here. Let me sort of look over them.
9       I have a fairly good understanding of --
10 perhaps an understanding of the role. I am not quite
11 as sure about the time commitment that we are talking
12 about here.
13      Does anybody have any kind of a clue as to
14 what the time commitment might be?
15      MR. KINSEL: No, Your Honor.
16      THE COURT: Mr. Dillard, ultimately -- I am
17 looking at counsel, both are looking, and the answer is
18 no, they don't.
19      The time commitment would be what Jim Dillard
20 felt was reasonable and necessary to take care of this
21 university in the interim period of time. I wouldn't
22 expect you to be spinning your wheels for the sake of

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

**Page 25**

1  spinning your wheels. I wouldn't expect you to be
2  having multiple meetings every time somebody wanted to
3  talk with you. It would be your show.
4  　　　What I want is this university to be in the
5  best possible shape it could be. I want it to be not
6  only kept afloat, but kept reasonable healthy to the
7  extent it can be in the interim period of time. How
8  much time you felt you needed to invest for that .
9  purpose, my intention was to leave that to your
10  discretion.
11  　　　I don't know how to run a university,
12  Mr. Dillard, and I surely don't know how to run this
13  university. So I wouldn't want to opine in a way that
14  would not really provide you any realistic guidance.
15  　　　But, obviously, you can only put in the time
16  you can put in.
17  　　　MR. PARROTT: Your Honor, I just talked to
18  counsel on both sides. Mr. Dillard could hire
19  assistants if he needed to do that if the time
20  commitment were an issue.
21  　　　THE COURT: Mr. Dillard, were you able to
22  hear that?

**Page 26**

1  　　　MR. DILLARD: Yes, that I could hire an
2  assistant or something.
3  　　　THE COURT: Whatever you needed to do to keep
4  things going in a way that Jim Dillard felt things
5  needed to be kept going, you are going to be given the
6  discretion to do what you felt you needed to do. If it
7  meant hiring some assistants because you could not
8  invest the time yourself, as long as you are the
9  ultimate decision-maker, nobody has a problem with
10  that.
11  　　　MR. DILLARD: Okay. And what we are talking
12  about here as far as compensation and expenses and
13  things like that?
14  　　　THE COURT: Well, tell me what you would have
15  in mind, Mr. Dillard, and I will pose that to counsel.
16  　　　MR. DILLARD: Well, I would think something
17  like 10,000 a month, something like that.
18  　　　Does that sound reasonable?
19  　　　MR. MARR: Yes, Your Honor.
20  　　　MR. KINSEL: I can't imagine that is not
21  reasonable, Your Honor.
22  　　　THE COURT: Mr. Dillard, that sounds entirely

**Page 27**

1  reasonable to me. I am not hearing anything to the
2  contrary from counsel.
3  　　　MR. KINSEL: I have a nod of the head.
4  That's fine on our side.
5  　　　THE COURT: Mr. Dillard, $10,000 a month plus
6  reasonable out-of-pocket expenses is acceptable to
7  everybody, including the Court.
8  　　　MR. DILLARD: And I would be traveling at
9  this point.
10  　　　THE COURT: Well, when you are saying
11  "traveling at this point," let us all know what you
12  mean, Mr. Dillard.
13  　　　MR. DILLARD: I'm talking about the gas
14  prices.
15  　　　THE COURT: Mr. Dillard, whatever the State
16  is paying for travel -- I think it is 44.5 cents at
17  this point. Whatever it may be, or what your actual
18  expense is for gas, I can't imagine that anybody is
19  going to quarrel with that.
20  　　　MR. KINSEL: Your Honor, that's not --
21  　　　THE COURT: If they do, I am going to tell
22  them "tough."

**Page 28**

1  　　　MR. KINSEL: That's not an issue at all.
2  　　　Your Honor, usually, I am jumping up; but
3  since the speaker is here, do you mind if we sit?
4  　　　THE COURT: Yes, sir; go ahead.
5  　　　MR. KINSEL: That's not going to be an issue,
6  neither the requested salary or the compensation, nor
7  the out-of-pocket expenses.
8  　　　Is Mr. Dillard local or is he traveling from
9  out of town?
10  　　　THE COURT: Mr. Dillard presently is out of
11  town. He is down in the Tidewater area.
12  　　　You are still hear locally?
13  　　　MR. DILLARD: I am local, yes.
14  　　　THE COURT: That shouldn't be an issue; but
15  if he is driving out to Manassas every day --
16  　　　MR. DILLARD: I'm a quarter mile from the
17  Annandale campus.
18  　　　THE COURT: Right. I knew that you lived in
19  your old district, and so I knew that Manassas is not
20  exactly around the corner.
21  　　　MR. KINSEL: It is not an issue from a cost
22  standpoint. I just wanted to make sure he was not

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

### Page 29

1  traveling from out of town, for his inconvenience.
2       THE COURT: No. He is local.
3       Obviously, if he is going away for a weekend
4  or something like that, to the extent that he feels he
5  needs to be in touch, there are other means for him to
6  stay in touch; but I didn't intend for him to cancel
7  all of his plans during the course of the summer.
8       MR. KINSEL: Of course not.
9       MR. DILLARD: Right. At this point, I only
10 have two things, and one of them would be that this
11 next week we have plans to go to Maine.
12      I can meet with at least one or two of the
13 groups on Monday. On Tuesday, I plan to go to New
14 Hampshire. That's only for less than a week -- I mean,
15 to Maine for less than a week; then I could commit
16 full-time.
17      The other commitment that I definitely have
18 is the Fourth of July weekend, that Wednesday through
19 Monday. Other than that, I am open.
20      THE COURT: Mr. Dillard, it has been in the
21 80's and sometimes the 90's in the courthouse. Do you
22 need somebody to carry your luggage up in Maine?

### Page 30

1       Mr. Dillard, that shouldn't be a problem.
2       In the event that you could have preliminary
3  meetings with the sides on Monday to lay down ground
4  rules as far as you are concerned, I would very much
5  appreciate that; because I think the reason we are
6  doing it today and at 8:00 o'clock in the morning is
7  this is the only time that I had free with my other
8  responsibilities. And I know that I want to try to
9  have things as set as we possibly can as quickly as
10 possible. And to the extent that you could meet with
11 both groups and they could arrange that with you on
12 Monday in Maine, I would very much appreciate you doing that
13 in Maine, I would very much appreciate you doing that.
14      MR. DILLARD: Well, I can certainly do that.
15      I assume that it would be better at this
16 point at least -- and maybe for quite some time -- to
17 meet separately.
18      THE COURT: At least initially, Mr. Dillard,
19 I think that would probably be in your best interests.
20      I want you to hear the perspective of both
21 sides, the concerns of both sides, and be able to ask
22 the questions of both sides that you deem appropriate.

### Page 31

1  But right now, I think it would be better if there were
2  separate meetings being held. That doesn't mean that
3  there is confidentiality, because I don't intend that
4  you are playing shuttle diplomacy going back and forth
5  and both sides are being kept in the dark about what is
6  going on with your discussions with the others.
7       If you had a board that you were the chair of
8  and there were, unfortunately, differences -- or as you
9  experienced them in the General Assembly, there would
10 be differences and people were coming to you to try to
11 help mediate a resolution that would be mutually
12 acceptable, it wouldn't be that everything that was
13 being said was going to be absolutely confidential.
14 You could divulge what needed to be divulged and maybe
15 respect the privacy of things that needed to respected.
16 I would envision you doing the same exact thing here.
17      MR. DILLARD: That's not a problem.
18      THE COURT: One of the things that I always
19 admired about you was your ability to go across the
20 aisle and to bring in people from both sides of the
21 aisle to do things that were in the best interests of
22 the citizens of this Commonwealth, and that's part of

### Page 32

1  the reason why Jim Dillard immediately popped into mind
2  when I thought about this potential role.
3       I would hope that you would be able to
4  accomplish the same things here with sides that
5  presently don't seem to agree on very much.
6       MR. DILLARD: I understand.
7       I would be willing to meet with somebody with
8  the Ho group at 9:00 o'clock on Monday.
9       THE COURT: Where would you like to do that?
10      MR. DILLARD: Let's make that 10:00 o'clock
11 because I will be driving up early that morning.
12      THE COURT: And where would you like that
13 meeting to take place, Mr. Dillard?
14      MR. DILLARD: How many people would be
15 involved?
16      MR. KINSEL: Your Honor, I think it would
17 just be a small handful. We would like a party
18 representative there, as well, most likely.
19      THE COURT: A party --
20      MR. KINSEL: Somebody from Mr. Ho's board to
21 be there, unless Mr. Dillard doesn't want to meet with
22 the parties themselves as part of this meeting up

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

## Page 33

1  front.

2      MR. DILLARD: No, that's fine.

3      THE COURT: I don't hear Mr. Dillard saying

4  he doesn't want to meet with the parties. I think

5  Mr. Dillard wants to be able to hear the concerns and

6  the perspectives of both sides --

7      MR. DILLARD: Absolutely.

8      THE COURT: -- and that way he is in the best

9  possible position to do what he believes to be in the

10  best interests of this university.

11      MR. KINSEL: There would probably be three to

12  five from our side.

13      THE COURT: Is three to five people okay with

14  you, Mr. Dillard?

15      MR. DILLARD: That's fine. And could we meet

16  at the Jewish center?

17      THE COURT: Could somebody make arrangements

18  to see if the meeting could take place at the JCC?

19      MR. PETERSEN: Annandale campus, Your Honor.

20      THE COURT: How about meeting at the

21  Annandale campus, Mr. Dillard?

22      MR. DILLARD: Well, I thought that was at the

## Page 34

1  Jewish Community Center. It is not?

2      THE COURT: It is not.

3      MR. DILLARD: Oh, okay. That's what I was

4  told.

5      THE COURT: Well, then, can we do this? I am

6  going to ask -- they will make logistical arrangements,

7  and I am going to ask -- Chap Petersen happens to be in

8  the room -- if Mr. Petersen would be willing to call

9  you and tell you so you will know where to go on Monday

10  morning.

11      Mr. Petersen is nodding he would be glad to

12  do that. I appreciate that again, Mr. Petersen.

13      Then they will give you an address, and they

14  will be there waiting for you at 10:00 o'clock.

15      MR. DILLARD: Okay. Now for the Avery

16  group --

17      THE COURT: Yes, sir.

18      MR. DILLARD: -- why don't we try to meet

19  with them at, like, 3:00 o'clock. Does that work?

20      MR. MARR: That's fine, Your Honor.

21      THE COURT: Where would you like to meet with

22  them?

## Page 35

1      MR. DILLARD: Well, I would rather not meet

2  in Manassas, but I can if I have to.

3      THE COURT: They will come to where you --

4  Mr. Dillard, this is your show. They are coming to

5  you. You tell them where to meet with you, and they

6  are coming.

7      MR. DILLARD: Actually, it makes more sense.

8  It probably would be a good idea to go on down to

9  Manassas.

10      THE COURT: I think to see the staff and the

11  layout might be of assistance to you. I would tend to

12  agree with you.

13      So, again, they will let Mr. Petersen know

14  exactly where, and they will make sure that they are

15  there. No more --

16      MR. DILLARD: I would just need an address

17  for that. I think it is Balls Road or something.

18      THE COURT: They will give the information to

19  Mr. Petersen and get you directions and make sure that

20  everything is all set.

21      Three to five people?

22      MR. MARR: Yes, sir, Your Honor.

## Page 36

1      THE COURT: Okay. There won't be any more

2  than three to five people from that group either,

3  Mr. Dillard.

4      MR. DILLARD: That's fine.

5      THE COURT: Okay?

6      MR. DILLARD: Okay.

7      THE COURT: Anything else that we can answer

8  for you?

9      MR. DILLARD: Well, let me just look very

10  quickly here.

11      THE COURT: Sure.

12      (Pause.)

13      MR. DILLARD: Now, are there two bank

14  accounts or just one bank account that we are dealing

15  with here as far as the funds are concerned?

16      MR. KINSEL: There are multiple bank

17  accounts.

18      THE COURT: There are multiple bank accounts,

19  but they will fill you in on that during the course of

20  the meeting.

21      The bank accounts, if I understand the

22  situation -- Counsel; correct me if I'm wrong -- have

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

**Page 37**

1  been under the control of counsel since --
2      MR. KINSEL: Two of the accounts, Your Honor.
3      THE COURT: -- two of the accounts. The
4  major ones are under control of counsel to make sure
5  that there wouldn't be any expenditures without joint
6  agreement. They will fill you in on that.
7      But, again, Mr. Dillard, what funds you feel
8  the university needs, you are going to tell them that
9  you want those funds. And I am authorizing you to
10 expend what you feel reasonably needs to be expended to
11 accomplish what I am hoping we can accomplish between
12 now and the time that a judge of this court rules on
13 the merits of the differences.
14     MR. MARR: A question, Your Honor?
15     THE COURT: Yes, sir.
16     MR. MARR: Would Mr. Dillard have the
17 discretion to make himself a signatory on those
18 accounts during the interim period?
19     THE COURT: Yes.
20     MR. MARR: Okay.
21     THE COURT: Mr. Dillard is running the
22 show --

**Page 38**

1      MR. MARR: That's fine by us.
2      THE COURT: -- as far as I'm concerned; and
3  what Mr. Dillard wants to do, he is going to do.
4      MR. MARR: That's fine by us.
5      THE COURT: He is going to consult as he
6  deems appropriate with both sides, but he is basically
7  the chancellor of this university between now and the
8  time that a decision is made on the merits.
9      MR. KINSEL: Your Honor, there is a court
10 order out there. There are some parts of what is being
11 expended that is subject to litigation that has to do
12 with salaries, et cetera.
13     THE COURT: You are going to discuss that
14 with him. To the extent that the court orders need to
15 be modified, the court orders will be modified. You
16 just present an order to me, and the court orders will
17 be modified.
18     Mr. Dillard, what I am looking to do -- and I
19 hope that this is clear -- is for you to make interim
20 decisions. I am not looking for you to make long-term
21 decisions as far as the running of the university. I
22 am looking for you to make the best decisions possible

**Page 39**

1  for this university in the interim period of time to
2  keep things going as well as they possibly can keep
3  going until the Court makes the decisions on the merits
4  the Court will obviously make. Okay?
5      Any other questions of Mr. Dillard?
6      Then, Counsel, give Mr. Petersen the
7  information so that Mr. Petersen knows where the
8  meetings will take place, and he can advise Mr. Dillard
9  accordingly.
10     Arrangements need to made for Mr. Dillard to
11 be paid. You all can talk about that on Monday, how it
12 is going to be done, out of what account. But everyone
13 is agreeing that $10,000 per month -- we are
14 envisioning as of now it appears to be two months. It
15 may be slightly more than two months.
16     If it is more than two months, it will be
17 prorated as appropriate for any period over the two
18 months. Everyone says that is agreeable.
19     Mr. Dillard will submit his expenses during
20 whatever time frames you all agree on Monday, and I
21 expect Mr. Dillard to be compensated on a timely basis
22 and to have his expenses reimbursed on a timely basis;

**Page 40**

1  because he is performing something that he doesn't have
2  to be doing, and he is doing it for the best interests
3  of this university.
4      I am very, very pleased to hear that
5  Mr. Dillard is willing to take on this responsibility.
6  It makes things a lot easier for me in the interim
7  period of time to know that this school is going to be
8  in the hands of somebody who I have respect for, Jim
9  Dillard. Okay?
10     Is there anything further? So Mr. Dillard
11 can go back to hopefully enjoying a little bit of his
12 time.
13     MR. DILLARD: All we need down here, Judge,
14 is a little wind.
15     THE COURT: Well, Mr. Dillard, I am hearing
16 it may go back up to 90 here today. I am hoping I will
17 be able to breathe in my courtroom.
18     We will see what we can do about sending some
19 wind down. There are some lawyers I know, Mr. Dillard,
20 that if I could send about 100 of them, you might be
21 better off.
22     MR. DILLARD: There you go.

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

---

**Page 41**

1      THE COURT:  And they may say, well, Judge, if
2  you go down there, we may only need 50.
3      MR. DILLARD:  Chap?
4      MR. PETERSEN:  Yes, sir.
5      MR. DILLARD:  You are going to give me a call
6  down here?
7      MR. PETERSEN:  I will call you, yes.
8      MR. DILLARD:  You have the 898 number?
9      MR. PETERSEN:  I have got your numbers.
10     MR. DILLARD:  Very good.  So I will be
11  hearing from you sometime tomorrow?
12     THE COURT:  Maybe this afternoon,
13  Mr. Dillard.  Mr. Petersen will be in touch.
14     Mr. Dillard, thank you very, very much for
15  taking on this responsibility.  I very much appreciate
16  it.
17     MR. DILLARD:  Thank you, Judge.  We will just
18  hope it works out.
19     THE COURT:  Thank you, sir.
20     MR. DILLARD:  Thank you.
21     THE COURT:  Bye-bye.
22     Okay.  Counsel, I want an order by tomorrow.

---

**Page 42**

1  I have criminal motions tomorrow, but why don't you
2  come in at 10:00 o'clock.
3     Mr. Kinsel, I don't think anybody won or
4  lost.  Both sides won a little and lost a little.  I am
5  going to ask you to draft an order consistent with my
6  ruling.  I want the compensation to be in so that there
7  is no possibility of a misunderstanding, and that that
8  is by agreement; and then to draft something consistent
9  with my ruling from the other day.  Okay?
10     I, obviously, want you to share it with
11  Mr. Marr, Ms. Austin Jones, or whoever they may
12  designate.  You can just fax things back and forth.
13     Then you can authorize them to endorse the
14  original with your signatures; or you can have it go
15  back and forth, however you all want to do that.
16     You all can feel free to note whatever
17  exceptions you want to note for the record to my
18  ruling, but I am convinced this is the right thing for
19  the interim period of time.  I am glad we were able to
20  accomplish it.  Okay?
21     MR. KINSEL:  Thank you, Your Honor.  Did you
22  still want to see us in chambers?

---

**Page 43**

1      THE COURT:  Let's talk about August; okay?
2     Mr. Marr, I know that Mr. Schraub was
3  concerned about a four-day trial and the length.
4     Did you have an opportunity to talk to him --
5  or, Ms. Austin Jones, did you -- about how much time
6  you feel that you do need?
7     MR. MARR:  Well, I think, Your Honor, if it
8  is the Court's intention -- which is clear -- that all
9  of the tort claims are going to be tried in addition to
10  the ownership and control issues, I just don't see --
11  now, setting aside the third-party claims that we filed
12  and the consolidation motions that are before Your
13  Honor on the 27th, just taking their claims and our
14  defenses, I don't see how that can be accomplished in
15  four days.
16     THE COURT:  Well, how many days would you
17  need to accomplish it?  Not damages; liability.
18     MR. MARR:  I think best case would be two
19  weeks.
20     THE COURT:  Eight days?
21     MR. MARR:  Eight days.
22     THE COURT:  Mr. Kinsel.

---

**Page 44**

1      MR. KINSEL:  I am not sure -- when you are
2  talking about liability, you are talking about just
3  control, or are you talking about liability on the
4  underlying torts as well?
5     THE COURT:  Well, isn't the evidence that
6  goes to the underlying torts going to be submitted by
7  both sides in support of their respective position for
8  control?
9     From the briefs, I had the impression that
10  the answer to that was going to be a resounding yes,
11  because there was going to -- all of the concerns that
12  were expressed in the affidavits and on brief are going
13  to be the subject of the presentation of evidence.
14     People are saying that this person did
15  something that he or she was not supposed to be doing,
16  and that it amounts to a tort, and also amounts to
17  something that is inconsistent with Virginia law or the
18  articles of incorporation or bylaws, I'm assuming that
19  is all going to be coming anyway.
20     MR. KINSEL:  The way I break it down, Your
21  Honor, is there is the control aspect of it.  There is
22  the, sort of, the pre-termination conspiracy aspect of

---

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

Page 45

1 it, which some of the torts are related to what we
2 think is a business conspiracy to set up a competing
3 university.
4     And then there are the tort claims involved
5 with post-termination. If they were properly
6 terminated in January, they have been acting improperly
7 from January until the Court's ruling of appointing a
8 receiver. There are some damages which are associated
9 with that.
10     THE COURT: The damages I am not talking
11 about right now. Wouldn't it be -- I don't believe
12 that a line was drawn in the sand as of the date that I
13 issued my injunction or when the suit was filed or
14 anything else as far as the control, who is entitled to
15 be running this university and this corporation.
16     I think the evidence potentially could be
17 educed all of the way through the day of trial.
18     MR. KINSEL: Oh, yes; but what I am saying
19 is --
20     THE COURT: So there would be on overlap, in
21 my mind, between the evidence on the tort claims even
22 post -- well, your terming where you drew the line a

Page 46

1 moment ago, it would seem to me that the evidence of
2 both pre- and post- would be admissible in evidence.
3     MR. KINSEL: Right. The other point is the
4 order is -- obviously, they are not acting unilaterally
5 anymore on behalf of the university unless the Court
6 entered the injunction and appointed Mr. Dillard.
7     So that part of the claim, there still might
8 be damages that is still stemming from the prior acts.
9 That is certainly true.
10     I think the disagreement on the timing, in
11 some ways we still can't answer your question because
12 we don't know the extent of the documentation. We
13 still haven't seen the documents.
14     So if there are --
15     THE COURT: The order should reflect the fact
16 that all of -- did I say seven days or ten days for --
17 ten days? All discovery is to be answered within ten
18 days.
19     MR. KINSEL: We are working on that. We are
20 not pointing fingers at all, but we haven't seen the
21 documents. When you ask how many days it is going to
22 take, if we have the exhibits we basically attached to

Page 47

1 the motion for temporary injunction, that is going to
2 be a much narrower aspect. If there are 50 or 60
3 exhibits that we think are relevant, that's going to
4 change it.
5     But one of the fundamental disagreements here
6 is whether or not third-party complaints will be viable
7 and whether the defenses that they put together -- they
8 have a 40- or 50-page grounds of defense, slash,
9 answer. What they are trying to bring through those
10 pleadings is essentially the bad acts or what they
11 think are the bad acts of Daniel Ho.
12     They are trying to try that in this case
13 where there are other cases pending. There are two
14 other cases pending that were filed by UNVA against
15 Daniel Ho and some other defendants.
16     THE COURT: Well, then, let's just do it this
17 way. You can tell Mr. Schraub to relax; the four-day
18 limitation is not going to be etched in stone. We will
19 be flexible.
20     I don't want to set a specific time frame
21 because I don't know who the judge is going to be.
22 Chief Judge Smith is out of town. He will be back next

Page 48

1 week. As I mentioned, he knows about this litigation.
2 He knows about the fact there are five lawsuits that
3 are going on. He knows there are consolidation
4 motions. It may be that we are going to have to deal
5 with consolidation motions before an ultimate
6 determination can be made about what is to be tried.
7     Our court, generally, does not get involved
8 in many pretrial conferences because we don't have the
9 time to do it with our trial schedule. But this is a
10 case that would seem to me having a pretrial conference
11 -- it may be very early in the morning -- where we can
12 hash out these issues and determine the most efficient
13 way to try to deal with all of this litigation may be
14 called for.
15     Let's see who Chief Judge Smith assigns to
16 hear this litigation, because I am very confident that
17 he will assign an individual judge when he gets back in
18 town. That judge can then discuss the situation with
19 counsel to figure out the most efficient way to handle
20 what we are doing.
21     Obviously, the most important consideration
22 as far as I am concerned is to have who is running the

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

Page 49

1   show determined as far in advance of the onset of the
2   fall semester as we possibly can so that whoever is
3   going to be running the university can take care of
4   what needs to be run instead of that type of a change
5   or that type of a reinforcement of the present status
6   taking place after the semester starts.
7       That's part of the reason why I ordered what
8   I have ordered, because I don't want to take a chance
9   that there is a shift and then there is a re-shifting,
10  which I am not sure this university could survive.
11      So let me talk to Chief Judge Smith when he
12  gets back in town on Monday, and then someone will be
13  in touch once Chief Judge Smith assigns a judge to hear
14  this litigation.
15      MR. KINSEL:  Your Honor, just consistent with
16  what you said the other day, my understanding is -- and
17  I assume it is opposing counsels' position as well --
18  is that we are all to stand down until tomorrow when
19  the actual order is entered and the meeting with
20  Mr. Dillard.  Is that --
21      THE COURT:  When you say "stand down" --
22      MR. KINSEL:  No one is supposed to act on

Page 50

1   behalf of the university, particularly unilaterally,
2   between today and tomorrow.
3       THE COURT:  I don't want anything being done
4   that is at all inconsistent with Jim Dillard making
5   decisions that need to be made.
6       You are all going to have an opportunity to
7   meet with him on Monday.  Then if there are concerns
8   that are immediate, that something needs to be done
9   from your client's perspective or your clients'
10  perspective, obviously, Mr. Dillard should be informed
11  about that.  Mr. Dillard can make whatever decisions
12  need to be made and make sure that the staff does what
13  he believes should be done under the circumstances.
14      So I don't -- it is my intention today, as it
15  was when I announced my decision, that there aren't
16  going to be made any types of decisions being made
17  other that than the day-to-day running of things that
18  have to be done.
19      If there is anything at all out of the
20  ordinary, I want there to be consultations at least
21  between counsel to make sure that things are being done
22  in a manner which is entirely consistent with what I

Page 51

1   have in mind.
2       Mr. Marr.
3       MR. MARR:  One other issue, Your Honor.
4       When this matter was set for the four-day
5   nonjury trial -- again, we apologize for the
6   misconception as to what was going to happen in August
7   -- our consent to the nonjury trial was because of the
8   impression that we had that it simply was going to be
9   limited to the ownership and control issue and not the
10  tort claims.
11      If the tort claims are, in fact, going to be
12  heard, then I think there needs to be some discussion
13  about having a jury involved in this case.  I only
14  raise that if the judge who is going to be assigned the
15  case needs to make that determination, then that's
16  fine.  I thought it was important to raise that now.
17      THE COURT:  I thought that came up at the
18  hearing that we had.  If I remember correctly, both
19  sides told me even then that there wasn't going to be a
20  request for a jury.  I think Ms. Austin Jones actually
21  spoke for your side of the equation.
22      But when we all get together, we will discuss

Page 52

1   that issue.  There are Constitutional rights that
2   people have to jury trials.  There are also things that
3   -- well, I am not going to say anything further.
4       Nothing is etched in concrete at this point.
5       MR. MARR:  Yes, Your Honor.
6       THE COURT:  Okay.  We will discuss, court and
7   counsel, how best to deal with this situation as long
8   as everybody understands that this is not going to turn
9   into the University of Northern Virginia circuit court
10  and that everything else that goes on in this court is
11  going to be set to the side because of the needs of
12  these particular litigants and the needs of this
13  university.  We are not going to do that.
14      We try, when there are unique types of
15  situations, to deal with cases in a way that is not the
16  way we deal with all cases.  This one, I believe, calls
17  out for some additional treatment, but that's going to
18  be up to the Chief Judge of the Court, and it is going
19  to be up to the judge who gets assigned to hear this.
20      You all will have an opportunity to present
21  your respective positions to that judge, and that judge
22  can determine how best to efficiently handle all

Hearing transcript
June 12, 2008

UNVA v. Avery, et al.
CL No. 2008-5145

Page 53

1  aspects of this litigation in a matter consistent with
2  a way that our court does its business.  We will cross
3  that bridge when we get to it.
4       But, again, nothing that has happened up
5  until now is etched in concrete where it can't be
6  undone.  There may be additional things, hearing from
7  Mr. Kinsel, that may come up based upon the review of
8  the documentation that they want to see.  There may be
9  other issues that are going to come up that they may
10  even want a jury trial.  We really don't know; let's
11  cross that bridge when we get to it.  Okay?
12       Anything further?  Okay.
13       I want an order 10:00 o'clock tomorrow
14  morning.  If there is a dispute relating to the wording
15  of the order, it depends on what is going on with the
16  rest of the criminal docket, but I will hear you
17  because I want to enter an order tomorrow.  I want a
18  copy of the order certified and delivered to
19  Mr. Dillard on Monday so Mr. Dillard knows what the
20  order says and that we can take it from there.
21       Okay?  Have a good day, everyone.
22       (Whereupon, the hearing in the above-entitled

Page 54

1  matter adjourned at 8:51 a.m.)
2           *   *   *   *   *
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 55

1           CERTIFICATE OF STENOTYPE REPORTER
2
3       I, RANDY T. SANDEFER, RPR, certify that the
4  proceedings in the above-entitled matter were taken by
5  me in stenotype and thereafter reduced to typewriting
6  under my direction and control; that said transcription
7  is a true record of the proceedings; that I am neither
8  counsel for, related to, nor employed by any of the
9  parties to the action in which this proceeding was
10  taken; and, further, that I am not a relative or
11  employee of any attorney or counsel employed by the
12  parties hereto, nor financially or otherwise interested
13  in the outcome of the action.
14       IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal this 12th day of
16  June, 2008.
17
18
19       _____
20           RANDY T. SANDEFER, RPR
21           Stenotype Reporter
22  Notary Registration Number:  246221

Attachment 3

University of Northern Virginia, Inc.        vs.        Fay R. Avery, et al.
hearing excerpt                                   Tuesday, June 10, 2008



**Page 1**

VIRGINIA:

    IN THE CIRCUIT COURT OF FAIRFAX COUNTY

UNIVERSITY OF NORTHERN   )
VIRGINIA, INC.,         )
    Plaintiff,   )
vs.          ) Case No. 2008-5145
FAY R. AVERY, et al.,  )
    Defendants.   )
    *   *   *   *   *

    Excerpt of the hearing in the
above-entitled matter held on Tuesday, June 10,
2008, commencing at 8:35 a.m., at 4110 Chain
Bridge Road, Fairfax, Virginia, before Laurel P.
Platt, RDR, CCR No. 0313203, Notary Public.

BEFORE:
    THE HONORABLE STANLEY PAUL KLEIN

    *   *   *   *   *

**Page 2**

1        A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4      JAMES B. KINSEL, ESQUIRE
5      W. MICHAEL HOLM, ESQUIRE
6      Womble, Carlyle, Sandridge & Rice, PLLC
7      8065 Leesburg Pike
8      Fourth Floor
9      Vienna, Virginia  22182-2738
10     703-790-4692
11     703-918-2247 - fax
12     jkinsel@wcsr.com
13
14
15
16
17
18
19
20
21
22   (Appearances continued on the next page.)

**Page 3**

1   APPEARANCES (continued):
2
3   ON BEHALF OF THE DEFENDANTS:
4      J. JONATHAN SCHRAUB, ESQUIRE
5      DANIEL M. HOWELL, ESQUIRE
6      MICHAEL T. MARR, ESQUIRE
7      Sands, Anderson, Marks & Miller
8      1497 Chain Bridge Road
9      Suite 202
10     McLean, Virginia  22101-5728
11     sschraub@sandsanderson.com
12     dhowell@sandsanderson.com
13     mmarr@sandsanderson.com
14
15
16
17
18
19
20
21
22

**Page 4**

1       P R O C E E D I N G S
2   - -  -  - -
3      THE COURT:  I've considered the
4  affidavits that have been presented, the
5  applicable legal authorities, the arguments of
6  counsel, the memoranda of counsel.
7      What is before the Court at this time is
8  the request by the plaintiff for a temporary
9  injunction.  What is requested is that I enjoin
10 the defendants from continuing to act on behalf of
11 the University of Northern Virginia, that I enjoin
12 them from using the name or the assets of the
13 University of Northern Virginia, and that I enjoin
14 them from entering the grounds of the University
15 of Northern Virginia until the case is heard on
16 its merits.
17     I have to decide the issues that are
18 before the Court based upon the context in which
19 it is presented to me today.  I cannot start to
20 speculate on what procedurally may happen between
21 now and a trial on the merits, what board meetings
22 may or may not take place, what votes may or may

A# 2

University of Northern Virginia, Inc.                    vs.                    Fay R. Avery, et al.
hearing excerpt                                                                 Tuesday, June 10, 2008

Page 5

1    not take place. I have to decide the issues based
2    upon the evidence before me at this time.
3         One thing that the parties agree upon is
4    that although the Virginia Supreme Court has not
5    yet specifically adopted a test to be utilized in
6    deciding preliminary injunctions, that I ought to
7    go ahead and utilize the Fourth Circuit so-called
8    Blackwelder test which has been utilized by many
9    courts throughout the Commonwealth.
10        And I will do that in part because it is
11   the culture and in part because I believe that the
12   Fourth Circuit's test is an excellent test to
13   utilize under circumstances where preliminary
14   injunction is requested, and it is particularly
15   helpful to me to look through the lens of the
16   Fourth Circuit's test in deciding what I have to
17   decide here.
18        The first two problems are the injury to
19   the plaintiff if I don't grant the relief that's
20   requested. Second is the injury to the defendants
21   if I do grant the relief that's requested.
22        Moreover, the injury to the plaintiff

Page 6

1    must be reparable because Virginia law is clear
2    that when injunctive relief is granted, that would
3    be an extraordinary remedy, and the moving party
4    must show irreparable harm in order for that
5    relief to be granted, citing, among other cases,
6    Black and White Cars vs. Groom Transportation,
7    Incorporated, at 247 Va. 426.
8         These are close to a wash as far as the
9    Court is concerned because no matter what the
10   Court eventually would do, there is the potential
11   of significant harm to both sides. If anything,
12   it may come out slightly in favor of the
13   plaintiffs under the circumstances, but there is
14   no factor that trumps all of the other factors
15   under the Blackwelder test. I am considering all
16   of the factors.
17        Third is the success on the merits. This
18   is ultimately, in the Court's view, the most
19   difficult question based upon the procedural
20   posture of this case.
21        Ultimately I believe that the plaintiff
22   probably had the upper hand on the issue of

Page 7

1    whether a shareholder agreement was entered into
2    which would be binding and would preclude the
3    plaintiffs from seeking the relief the plaintiffs
4    are seeking on the merits.
5         But the issue of whether the plaintiffs
6    have taken the correct procedural steps under
7    Virginia law, the corporation's articles of
8    incorporation and bylaws, to rescind the bylaws
9    which would have to be rescinded in order to grant
10   the relief that the plaintiffs are seeking is a
11   much closer question as far as the Court is
12   concerned.
13        Are the bylaws that were enacted in 2005
14   in conflict with the amended articles of
15   incorporation that were enacted, if I remember
16   correctly, in 2001, or are they simply a
17   limitation of the articles of incorporation that
18   were amended in 2001?
19        Ultimately what these parties decided to
20   do in 2005 was to have a Board of Trustees run
21   this University, obviously without any
22   anticipation of the difficulties occurring which

Page 8

1    had occurred. But as of 2005, this university was
2    to be run by a Board of Trustees. Bylaws were
3    enacted, and among the bylaws that were enacted
4    was a limitation on the rights of informal action
5    allowable under the applicable Virginia statutes.
6         From 2005 until late 2007, this
7    University and this corporation was run based upon
8    what has been set forth in the bylaws enacted in
9    2005.
10        Ultimately if the procedural posture is
11   the same at the time of the final hearing as far
12   as what actions have or have not been taken, a
13   judge is going to have to decide whether there is
14   a conflict, which means that the bylaws are of no
15   effect, or whether there was simply a limitation,
16   in which case the bylaws would remain in effect
17   unless they are properly amended or rescinded
18   pursuant to Virginia law and pursuant to the
19   articles of incorporation and bylaws of this
20   particular corporation.
21        Again here, slight advantage to the
22   plaintiff, but I believe that this is a close

University of Northern Virginia, Inc.      vs.      Fay R. Avery, et al.
hearing excerpt                                   Tuesday, June 10, 2008

**Page 9**

1  legal question, and it's a question that cannot
2  really be determined or should not be determined
3  on its merits until such time as the Court can
4  hear all of the evidence as to what the intentions
5  of the parties in fact were in 2005.
6        Ultimately, the most important factor as
7  far as I'm concerned at this point, and in 16
8  years on this bench it's the only time that I can
9  remember this being a major factor in my decision
10  in granting or denying a preliminary injunction,
11  is the public interest.
12        This is a private corporation, but it is
13  a private corporation that affords students both
14  of the United States and internationally to obtain
15  an education and a degree.  There are students who
16  are going to be affected.  There are faculty who
17  are going to be affected.  There is a university
18  that is going to be affected.
19        The remaining ability of this University
20  to withstand the implications of this dispute and
21  the injuries that are necessarily flowing now and
22  may continue to flow as a result of this ongoing

**Page 10**

1  dispute is something that the Court believes
2  implicates the public interest and which must be
3  weighed appropriately along with the other
4  factors.
5        As the Fourth Circuit opines in
6  Blackwelder, and I quote from the Blackwelder
7  court at page 197 of 550 Fed. 2nd:  Preserving the
8  status quo ante litem until the merits of a
9  serious controversy can be fully considered by a
10  trial court is typically in the public's best
11  interests.
12        Ultimately here from 2005 to 2007, the
13  Board of Trustees was running this university.
14        The plaintiff is not asking me to
15  maintain the status quo.  The plaintiff is asking
16  me to modify the status quo and to basically take
17  out the ruling group and preclude them from even
18  being on the campus.  Maintaining status quo
19  versus changing status quo is something again that
20  I believe that I need to consider in determining
21  what I'm asked to determine today.
22        I am also concerned that if I modify the

**Page 11**

1  status quo or completely change the status quo
2  today and a hearing is held on the merits, which
3  is going to take place in August --
4  notwithstanding any misunderstandings that
5  Mr. Schraub may have had or his firm may have had,
6  there's going to be a final decision on the merits
7  of at least liability in August.
8        And if I were to now say that everybody
9  from the Avery side is banned from this campus in
10  Manassas, the Ho people come onto this campus and
11  take over, obviously that would be a major change.
12  There are potentially implications for everybody
13  involved if I were to effect such a change, based
14  upon what I've read in the affidavits.
15        And then if August came, and after the
16  parties had a full and fair opportunity to present
17  all of the evidence, if the result was completely
18  to the contrary, and that the Ho group is told
19  you're out, the Avery group to the extent that it
20  still exists is you're back in, then the damage to
21  this university would be exponentially increased
22  as far as the Court is concerned.  And that again

**Page 12**

1  is something that I believe needs to be taken
2  appropriately into consideration at this time.
3        As I mentioned earlier, the irreparable
4  damage, which is really part of factor number one,
5  the injury to the plaintiff, but is something that
6  must be taken into consideration in deciding all
7  of these factors and how they should play
8  together, can I prevent there being irreparable
9  damage by the issuance of a preliminary
10  injunction.
11        And based upon the stipulations that I
12  heard from counsel a few minutes ago, there is a
13  way that I believe that irreparable damage can be
14  completely avoided and still maintain what I
15  believe needs to be maintained in the interim
16  period of time based upon the evidence and the
17  arguments of counsel.
18        Therefore, the request for the
19  preliminary injunction and the specific
20  preliminary injunction that's been requested is
21  granted in part and it's denied in part.
22        I grant the injunction to prevent the

Page 13

1  defendants from continuing to act solely on their
2  own behalf of the University of Northern
3  Virginia.
4        The defendants agree that I have the
5  authority based upon their stipulation to have a
6  representative, such as James Dillard, serve as
7  the decision maker in the interim period of time.
8        I'm not going to allow the defendants to
9  act totally on their own behalf on behalf of the
10 University of Northern Virginia or to use the
11 University's bank accounts or other assets or its
12 name totally on their own.  They're going to have
13 to do it in conjunction with James Dillard, if
14 Mr. Dillard is willing to serve in this role, and
15 Mr. Dillard is going to be the ultimate decision
16 maker.
17       He's going to decide whether any new
18 lawsuits should be filed in the interim period of
19 time, and I would hope that Mr. Dillard would not
20 have lawsuits being filed in the interim period of
21 time unless there is absolute irreparable damage
22 that's going to occur unless those lawsuits were

Page 14

1  filed at this time.
2        Mr. Dillard is going to determine who has
3  access to the different records to make sure that
4  the university can continue to operate.
5        Mr. Dillard is going to set the policy as
6  far as transfers and enrollment and the students
7  and diplomas and other things that have caused
8  disputes between these parties.
9        Mr. Dillard is going to decide who is
10 going to have access to offices.  Mr. Dillard is
11 going to decide whether Mr. Ho and/or Mr. Lee are
12 going to have access to things on the Manassas
13 campus.
14       He's going to decide whether, in light of
15 all the circumstances existing under his control
16 and decision making, they should have their own
17 offices at the Manassas campus so that he can have
18 ready access to them to the extent that he deems
19 it appropriate and necessary to do so.
20       But Mr. Dillard, whether it's by way of
21 discussing this directly with me and counsel if he
22 takes on this role or simply by giving him a copy

Page 15

1  of the transcript to be prepared, it is clearly my
2  intention for Mr. Dillard to consult with both
3  sides of the ongoing dispute so that he can
4  understand the context of any ongoing disputes and
5  he can gain the benefit of the insights of both
6  sides in making the decisions that I want him to
7  make to further the interests of the public and
8  this university in the interim period of time.
9        Basically Mr. Dillard is going to run the
10 day-to-day operations of the University of
11 Northern Virginia.  He can delegate
12 responsibilities to things that are really of not
13 great consequence, because I don't want
14 Mr. Dillard to have to take on the role of every
15 single administrator for this university.  That
16 would not be fair to Mr. Dillard, nor is it really
17 what I envision.
18       But what I do envision is that
19 Mr. Dillard is going to make sure in the interim
20 period of time that there is not going to be
21 irreparable damage to this university in the
22 interim period of time or, to the extent that he

Page 16

1  can avoid it, to the interests of the different
2  parties to this lawsuit in the interim period of
3  time; and that Mr. Dillard, based upon his over 30
4  years of experience with education in the State of
5  Virginia, will do what is necessary to further the
6  interests of this university to the extent that
7  those interests could be appropriately and
8  adequately protected, notwithstanding the ongoing
9  dispute among the principal actors in this
10 university.
11       With the concurrence of the party against
12 whom the injunction is being issued, I believe I
13 have the authority to so empower Mr. Dillard
14 because he is carrying out the limited injunction
15 that I'm granting against the defendants for the
16 reasons that I've articulated.
17       I am required by 8.01-620 to require the
18 plaintiffs to post a bond.  The bond is going to
19 be $1,000 cash.
20       I do not believe, if Mr. Dillard takes on
21 this role, that I need to establish a bond that is
22 going to cause unnecessary expenditure of the

University of Northern Virginia, Inc.
hearing excerpt

vs.

Fay R. Avery, et al.
Tuesday, June 10, 2008

Page 17

1  funds that belong to whoever is going to wind up
2  running this corporation. That shows the extent
3  of my trust and respect for Mr. Dillard.
4        This case is going to be tried on its
5  merits in August. If it needs to be more than
6  four days, if there was some misunderstanding, I
7  will hear from counsel as to whether the trial
8  should be given more than four days.
9        But what I envision right now is a trial
10  on the merits of whether there should be a
11  permanent injunction that's necessary, who is
12  going to be running the corporation going forward,
13  and the liability aspects of the tort claims to
14  the extent the tort claims are going to be
15  prosecuted.
16       If we cannot try this in a reasonable
17  period of time and the discovery cannot be
18  completed in a reasonable period of time, I may be
19  willing, under the unique circumstances of this
20  case, to bifurcate liability and damages, but the
21  liability aspects are going to be tried along with
22  everything else in August.

Page 18

1        Chief Judge Smith is away for the rest of
2  this week. When he gets back, I will discuss the
3  issue with him. He will determine who the trial
4  judge is going to be, and he will make the
5  ultimate decision, as chief judge of the Fairfax
6  County Circuit Court, whether there's going to be
7  a bifurcation.
8        In light of the fact that the parties
9  agreed at scheduling to have the trial on the
10  merits -- because as I said before, my
11  recollection is entirely consistent with
12  Mr. Kinsel's -- all discovery is going to be
13  answered within ten days. So that the parties can
14  propound and get what they need to be ready to try
15  the case on the merits in August.
16       I do not want to have, nor will I
17  tolerate, unreasonable positions by either side as
18  far as discovery is concerned. Both sides should
19  have complete access to the relevant documents and
20  records of the university so that both sides are
21  in a position to present to the Court what needs
22  to be presented for the Court to decide all of the

Page 19

1  issues involved in this case, and there should be
2  liberal discovery.
3        How the actual documents exchange will
4  take place as far as the records of the
5  university, Mr. Dillard again is going to have
6  control over the logistics. But, Counsel, I'm
7  telling all of you, I want everything to be turned
8  over that is in any way reasonably calculated to
9  lead to discovery of admissible evidence.
10       That does not mean that I'm going to
11  allow abusively overbroad discovery to be
12  propounded and have to be answered in the ongoing
13  dispute between these parties because that is
14  simply not going to happen.
15       But so that everybody understands what
16  the expectation is, I want there to be
17  appropriately liberal discovery because I don't
18  want either side to have to walk into this trial
19  in August without having a reasonably good idea
20  about what's coming from the other side and
21  appropriate access to those documents that each
22  side needs in order to present their side's

Page 20

1  position in a manner that will be sufficient as
2  far as the Court is concerned.
3        That's my ruling.
4        Plaintiff's exception is noted to my
5  ruling for the reasons that have been articulated
6  and to the extent that my ruling is inconsistent
7  with the specific relief that they've requested in
8  their injunction.
9        The defendants' exception is noted to the
10  extent that my ruling is inconsistent with the
11  defendants' position and the fact that I'm
12  granting any injunctive relief at all.
13       MR. KINSEL: Your Honor, if I might, just
14  a point of clarification. No argument at all.
15  There's a couple things that I don't think you
16  touched on. And again, I'm not stating an
17  argument. I appreciate the amount of time you've
18  taken to enter your ruling.
19       There is -- and maybe this is all just
20  for Mr. Dillard. There is a no-trespass order
21  from Prince William for I believe Mr. Ho if he
22  tries to go onto the campus, and there's security

University of Northern Virginia, Inc.                   vs.                    Fay R. Avery, et al.
hearing excerpt                                                                Tuesday, June 10, 2008

| Page 21 | Page 23 |
|---|---|

**Page 21**

1  guards and they've got a no trespass.  Would that
2  be something that Mr. Dillard would be able to
3  rescind?
4        THE COURT:  Absolutely consistent with
5  what I just said.  Mr. Dillard is going to
6  determine whether there's going to be any change
7  in the policies about how things are going to be
8  done and access for Mr. Ho and/or Mr. Lee or
9  anybody else from your side in the interim period
10  of time.
11        That's something that I expect
12  Mr. Dillard to consult with both sides and then
13  determine what is in the best interests of the
14  public and this university in the interim period
15  of time until the parties can have a full and fair
16  opportunity to present all the evidence that a
17  court needs to hear in determining who is going to
18  be going forward running this university.
19        MR. KINSEL:  From an administrative
20  standpoint, would you want one of the parties to
21  contact Mr. Dillard or are you envisioning the
22  Court --

**Page 22**

1        THE COURT:  Well, I see that Mr. Peterson
2  is here.  I was going to ask how logistically this
3  should be done, because I almost called
4  Mr. Dillard and then felt that would be an
5  inappropriate ex parte communication with
6  Mr. Dillard.
7        Because Mr. Dillard may simply say judge,
8  I appreciate the respect you've shown and the
9  confidence you've shown, but at this stage of my
10  life, this is simply not something that I'm
11  willing to undertake or that I feel, in light of
12  my involvement with this university, it's
13  something I should not do.
14        If Mr. Dillard says no, then you come
15  back to me, and there is an injunction or there is
16  no injunction.  I will announce a decision.
17        But how it is to be done, I would like to
18  have a brief hearing early next week, if
19  Mr. Dillard is willing to take this on, with
20  counsel, with me, with Mr. Dillard, on the record,
21  so that Mr. Dillard can ask whatever questions he
22  wanted to ask so that he understands the import of

**Page 23**

1  my decision and what I have in mind, and so that I
2  can answer whatever questions he may have or I can
3  address to him any questions that I may have under
4  the circumstances.
5        Does anybody object to my asking
6  Mr. Peterson, a member of the senate, who I know
7  has been in touch with Mr. Dillard, based upon
8  what was presented last Friday, as to what, if
9  any, additional information he can tell me now so
10  that we can find out if we are heading down a path
11  that is simply not viable?
12        Mr. Kinsel, do you have a problem with my
13  addressing him at this point?
14        MR. KINSEL:  No, Your Honor, I do not.
15        THE COURT:  Okay.  Mr. Schraub, do you
16  have any problem with my asking Mr. Peterson what,
17  if any, additional information he might be able to
18  relate to the Court at this point so I can
19  determine logistically how we are going from here?
20        MR. SCHRAUB:  I have no problem with
21  that.  The record should show Mr. Peterson is a
22  litigant in one of the cases, so the record -- not

**Page 24**

1  a litigant -- an attorney for the Power Academy.
2        THE COURT:  Okay.  Well, the Power
3  Academy litigation, as far as I'm concerned, is
4  unrelated to this unless somebody is going to
5  convince me that that's something that needs to be
6  tried in August.
7        There are pending motions for
8  consolidation of the different cases that are on
9  the Court's docket for June 27th.  I intend to
10  conduct the hearing on the motions to consolidate
11  in light of my ruling today and determine what the
12  situation is.
13        I'm not asking Mr. Peterson to do
14  anything now other than to tell me about his
15  communications with Mr. Dillard, if there have
16  been any further communications with Mr. Dillard.
17        And then if Mr. Peterson is involved in
18  the ongoing litigation, that will probably be the
19  last time that I will ask Mr. Peterson to relate
20  anything to the Court, plus I would rather speak
21  directly to Mr. Dillard if he's willing to
22  undertake this role.

University of Northern Virginia, Inc.
hearing excerpt

vs.

Fay R. Avery, et al.
Tuesday, June 10, 2008

Page 25

1    The other thing we have to discuss with
2    Mr. Dillard is how he's going to be compensated
3    for this because it's not my expectation for him
4    to be doing this without being reasonably
5    compensated, unless that's a decision that he
6    makes under the circumstances; but my intention is
7    to have him be appropriately compensated for his
8    time. And that's something that we would probably
9    address when Mr. Dillard is here. Okay?
10    If nobody objects to Mr. Peterson telling
11    me about what, if any, additional communications
12    he's had. Mr. Peterson, have you spoken to
13    Mr. Dillard since we last spoke last Friday?
14    MR. PETERSON: Your Honor, I have not
15    spoken to him since then. I did want to relate a
16    couple of details because I did speak to him at
17    length on Friday during the hearing.
18    I am Chap Peterson. I do represent Power
19    Academy. It's not a party to this case, but it
20    does have an affiliated role. I served in the
21    General Assembly with Mr. Dillard.
22    When I spoke with him, I didn't say who I

Page 26

1    represented. I didn't discuss the merits of the
2    case. I simply brought up the University of
3    Northern Virginia. We spoke about he was familiar
4    with it, and I asked if he might be willing. I
5    said his name had been mentioned in the courtroom
6    about being willing to be receiver. He was open
7    to that.
8    The two questions that he had was the
9    amount of the time commitment and whether or not
10    he would be compensated. Obviously, those are
11    details that I felt that the Court ought to ask
12    him directly. I wasn't in a position to answer
13    that question. But I just wanted to relate those
14    questions to the Court.
15    THE COURT: Okay. Well, the
16    compensation, the answer is yes.
17    And the amount of time I think he's going
18    to need to take a look at. I think he needs to
19    consult with the parties and then determine what
20    he believes to be the necessary time commitment.
21    And the limitations on his ability to do it based
22    upon plans that he may have between now and August

Page 27

1    and the other things that are going on in his life
2    right now are things that I would intend to
3    discuss with him before I enter an order
4    appointing him.
5    MR. PETERSON: Your Honor, should I have
6    him contact Your Honor directly or should I have
7    him come back in open court?
8    THE COURT: I would prefer, in light of
9    the ongoing difficulties between these parties, to
10    have it done in open court. I don't want to have
11    any ex parte communications. I'd like everything
12    to be on the record.
13    Do you disagree with that, Mr. Kinsel?
14    MR. KINSEL: No, Your Honor.
15    THE COURT: Mr. Schraub, do you disagree
16    with that?
17    MR. SCHRAUB: No, I certainly agree with
18    that. I agree that as soon as possible, we ought
19    to get the Court to speak with the receiver and
20    determine what his availability is to get this
21    thing cleared up once and for all.
22    THE COURT: Monday morning at 8:30?

Page 28

1    MR. PETERSON: I'll tell him to be here,
2    Your Honor.
3    THE COURT: Well, ask him to be here.
4    MR. PETERSON: I'll ask him to be here.
5    THE COURT: If he can be here, and I'd
6    like if a phone call could be made right now
7    before you all leave to find out if that's doable.
8    MR. PETERSON: Go out in the hall?
9    THE COURT: Go out in the hall and just
10    make a call. I've got to go back to my jury trial
11    that was supposed to have started ten minutes ago.
12    I'd like to find out if he could be here;
13    and if he can be here, I'd like to do it at 8:30
14    on Monday morning. Then I'll ask one of the
15    attorneys to draft an appropriate order, but I
16    don't want to take the time to draft the order if
17    for some reason Mr. Dillard can't serve in that
18    role.
19    If he can't serve in that role at this
20    point, then I'm not sure that I'm going to start
21    anew with just picking somebody, because he has
22    some knowledge of the running of this university,

University of Northern Virginia, Inc.　　　　　　vs.　　　　　　　　　　Fay R. Avery, et al.
hearing excerpt　　　　　　　　　　　　　　　　　　　　　　　　　Tuesday, June 10, 2008

Page 29

1    which I think is invaluable, in addition to his
2    long experience with education in the State of
3    Virginia, which is why he was my first choice in
4    the very beginning when I was thinking about the
5    possibility of having somebody in this role in the
6    interim period of time.
7            Okay?
8            MR. PETERSON:  I'll call him in the
9    hallway.
10           THE COURT:  Take counsel with you, if you
11   would, please.  I'd like them to be part of the
12   conversation.
13           And I'll see everyone at 8:30 on Monday
14   morning until I hear something to the contrary.
15           Hold on.  Today is Tuesday.  Excuse me
16   one moment to take a look at my calendar.
17           Mr. Peterson, I don't know if Mr. Dillard
18   is an early riser or not, and I'm usually not that
19   early of a riser, but I'd like things to be in
20   place one way or the other at the earliest
21   possible opportunity.
22           I have a commitment Wednesday.  I have a

Page 30

1    commitment tomorrow morning.  I actually have a
2    commitment on Thursday morning, depending on what
3    goes on with my jury trial.  If Mr. Dillard could
4    come at 8:00?
5            MR. PETERSON:  On which day?
6            THE COURT:  On Thursday.  If that's
7    doable with counsel, I'd like to do it Thursday
8    morning at 8:00 o'clock.  My meeting starts at
9    9:00.
10           MR. SCHRAUB:  I won't be here but --
11           THE COURT:  Can somebody else from your
12   firm be here?
13           MR. SCHRAUB:  Yes.  I'm at graduation.
14           THE COURT:  Okay.  Mine is Thursday
15   night.
16           Let's do it then, if Mr. Dillard is
17   enough of an early riser.  If that's going to
18   cause an inconvenience for him, then we'll do it
19   Monday morning.  But if you would let me know so
20   that we can plan accordingly.
21           In the interim period of time, until the
22   hearing takes place with Mr. Dillard, there is an

Page 31

1    injunction issued against anyone issuing any
2    checks --
3            MR. KINSEL:  Your Honor, there is an
4    order in place on the checks that allows both
5    counsel to agree upon a check.
6            THE COURT:  I was just thinking unless
7    there's an agreement between counsel.
8            MR. KINSEL:  There's an order already.
9            MR. SCHRAUB:  We have a system that's
10   kind of rickety, but it is --
11           THE COURT:  So I don't have to worry
12   about anything taking place in the interim period
13   of time.
14           I don't want there to be any change in
15   the status quo based upon disappointment on one
16   side or both sides about my ruling today.  I don't
17   want anything to change until Mr. Dillard gets in.
18           So both sides are telling me I don't have
19   to issue any type of an injunction as of now.
20           MR. KINSEL:  No, Your Honor.  There's
21   nothing we can do on our side anyways.
22           THE COURT:  As long as everybody agrees,

Page 32

1    then I won't do something that's unnecessary.
2            MR. HOWELL:  Your Honor, Mr. Kinsel is
3    correct.  The order that was entered by Judge
4    Vieregg deals with the issuance of checks, and
5    both sides have been working diligently under that
6    order as best as they can for some time now.
7            THE COURT:  I just didn't want anything
8    untoward to happen in the interim period of time
9    as a result of an ongoing disagreement.  Okay?
10   Then I'll leave counsel to oversee that.
11           Mr. Peterson, if you would simply let me
12   know that one way or the other, I'd very much
13   appreciate it.  And just let everybody know, so
14   people know the parameters and the timing.  Okay?
15           We stand in recess for this hearing.
16   I'll take a five-minute recess and then go on to
17   my jury trial.
18           (Whereupon, at 9:45 a.m. the proceedings
19   were concluded.)
20
21
22

University of Northern Virginia, Inc.                     vs.                          Fay R. Avery, et al.
hearing excerpt                                                                        Tuesday, June 10, 2008

Page 33

1          CERTIFICATE OF REPORTER

2             I, Laurel P. Platt, do hereby certify

3      that the foregoing proceedings were taken by me in

4      stenotype and thereafter reduced to typewriting

5      under my supervision; that I am neither counsel

6      for, related to, nor employed by any of the

7      parties to the action in which these proceedings

8      were taken; and further, that I am not a relative

9      or employee of any attorney or counsel employed by

10     the parties hereto, nor financially or otherwise

11     interested in the outcome of the action.

12     _____

13         Laurel P. Platt

14         Notary Public

# Attachment 4

### UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF COLUMBIA

DANIEL F. HO, et al.                                )        Civil Action No. 08-757
                                                   )
         Plaintiffs,                               )
                                                   )
                                                   )
STUDENT AND EXCHANGE                               )
VISITOR PROGRAM,                                   )
et al.,                                            )
                                                   )
         Defendants.                               )
_____             )

### THIRD DECLARATION OF DIANNE CURRIE

1.   I am the Acting Chief of the School Certification Branch which is part of the Student
     and Exchange Visitor Program at the United States Immigration and Customs
     Enforcement (ICE), United States Department of Homeland Security.

2.   This declaration is based upon my personal knowledge, information obtained from
     other individuals employed by ICE and information obtained from records maintained
     by ICE.

3.   James Dillard II contacted me via telephone on June 26, 2008 and informed me that
     he was appointed to run the operations of the University of Northern Virginia
     (UNVA) by the Circuit Court for Fairfax County, Virginia.  I have attempted to
     contact Mr. Dillard in order to receive written verification, including a copy of the
     Circuit Court Order, as to this appointment.

4.   Should this verification be received, Mr. Dillard, by virtue of the authority vested in
     him by the Fairfax County Circuit Court, would qualify as the head of the school
     under 8 C.F.R. § 214.3(l)(l) and would have the authority, pursuant to 8 C.F.R. §
     214.3(l)(l), to appoint a new Principal Designated School Official (PDSO) for UNVA
     in place of the current PDSO, Fay Avery.

5.   Mr. Dillard informed me that Mr. Avery will remain PDSO for UNVA.  This was
     only after I informed Mr. Dillard that Mr. Avery was listed as PDSO and about Mr.
     Avery's function to change anything on UNVA's Form I-17 petition.  Mr. Dillard
     told me he saw no problem in keeping Mr. Avery as PDSO.

Att 4

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief, and based upon records maintained by ICE.

Executed on July 7, 2008

Dianne Currie
Acting Chief, School Certification Branch
Student and Exchange Visitor Program
U.S. Immigrations and Customs Enforcement
Department of Homeland Security

# Attachment 5

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

DANIEL F. HO, et al.                    )       Civil Action No. 08-757
                                        )
      Plaintiffs,                   )
                                        )
                                        )
STUDENT AND EXCHANGE                    )
VISITOR PROGRAM,                        )
et al.,                                 )
                                        )
      Defendants.                   )
                                        )

**FOURTH DECLARATION OF DIANNE CURRIE**

1.  I am the Acting Chief of the School Certification Branch which is part of the Student and Exchange Visitor Program (SEVP) at the United States Immigration and Customs Enforcement (ICE), United States Department of Homeland Security.

2.  This declaration is based upon my personal knowledge, information obtained from other individuals employed by ICE and information obtained from records maintained by ICE.

3.  James Dillard II, by virtue of the authority vested in him by the Fairfax County Circuit Court, in *University of Northern Virginia, Inc. v. Fay R. Avery, et al., Case No. 2008-5145* (Va. Cir. Ct. June 13, 2006) (order granting temporary injunctive relief), qualifies as the head of the school under 8 C.F.R. § 214.3(l)(l) and has the authority, pursuant to 8 C.F.R. § 214.3(l)(l), to appoint a new principal designated school official (PDSO) for the University of Northern Virginia (UNVA).

4.  On July 9, 2008, James Dillard informed me of his intention to change the administrative staff of UNVA, including the PDSO.

5.  On July 11, 2008, James Dillard informed me that Fay Avery resigned as the PDSO of UNVA. Mr. Avery also informed me the same day that he was resigning as PDSO.

6.  On July 15, 2008, Mr. Dillard informed me that Mr. Avery resigned from UNVA and formally requested that Daniel Ho be appointed as PDSO.

7.  SEVP approved Mr. Dillard's request to appoint Daniel Ho as PDSO and, on July 17, 2008, completed the reprogramming of the access codes for Daniel Ho in the SEVIS computer database.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief, and based upon records maintained by ICE.

Executed on August 14, 2008

Dianne Currie
Acting Chief, School Certification Branch
Student and Exchange Visitor Program
U.S. Immigrations and Customs Enforcement
Department of Homeland Security

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DANIEL F. HO, <u>et</u> <u>al.</u>,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 08-757 (JDB)** |
| | ) | |
| **STUDENT EXCHANGE VISITOR** | ) | |
| **PROGRAM, <u>et</u> <u>al</u>.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

<u>**ORDER**</u>

      Upon consideration of Defendants' Motion to Dismiss on mootness grounds, the

opposition and reply, and after a review of the entire record in this case, it is this _____ day

of _____, 2008

      ORDERED, that Defendants' Motion be, and hereby is, granted, and it is

      FURTHER ORDERED, that this case is dismissed with prejudice.


                              _____
                               UNITED STATES DISTRICT JUDGE